UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SCOTT A. HANNIGAN,
MICKEY HANNIGAN, and
SHARON HANNIGAN,

        Plaintiffs

v.                                    CIVIL ACTION NO. 2:02-1286

THE UNITED STATES OF AMERICA,

        Defendant


MEMORANDUM OPINION AND ORDER

On October 24 and 25, 2006, the court conducted a bench trial in this action.  On December 4, 2006, the government submitted its supplemental findings of fact and conclusions of law.  On December 8, 2006, plaintiffs submitted their revised proposed findings of fact and conclusions of law.  The court deems the matter submitted for decision

I.

The following discussion represents the court's preliminary findings of fact.  Each finding is made by a preponderance of the evidence.

This action arises out of the purported failure of Dr.

1

Hortencia Fernandez, M.D., ("Dr. Fernandez") to properly examine, diagnose and treat Scott Hannigan during Scott's July 19, 1999, office visit.

A.  Scott Hannigan's Relevant Medical History Prior to July 19, 1999

Plaintiff Scott Hannigan is a twenty-eight year old male.  (Trial Transcript at 30-31) (hereinafter "Tr. at ____").  Plaintiffs Mickey and Sharon Hannigan are Scott's parents.  (Tr. at 31).

Scott first visited Dr. Fernandez, a doctor employed at the Upper Kanawha Health Association, on May 19, 1997.  (Tr. at 243).  At that visit, Scott's chief complaint was acne, his weight was 130.5 pounds and his blood pressure was 100 over 50.  (Id. at 244; Pls.' Ex. 2 at pg. 1).  Dr. Fernandez next saw Scott on January 12, 1998, when he complained of a sore throat, abdominal pain, diarrhea for one month, and intermittent vomiting.  (Tr. at 247; Pls.' Ex. 2 at pg. 4).  Scott's weight at that visit was 128 pounds; blood pressure was not taken.  (Pls.' Ex. 2 at pg. 4).  At Sharon Hannigan's request, Dr. Fernandez referred Scott to Joseph J. White, Jr., M.D. ("Dr. White"), a gastroenterologist.  (Tr. at 327).

2

On January 20, 1998, Dr. White saw Scott.  (Dr. White letter, Pls. Ex. 2 at pg. 10).  According to Dr. White, Scott had experienced an unintentional twenty-pound weight loss and had a six-month history of diarrhea.[1]  (Id.).  At that visit, Dr. White also directed that lab tests be done on Scott.  (Tr. at 327).  Dr. White observed that Scott was "somewhat thin" and that he "most likely had an irritable bowel syndrome."  (Id.).

Dr. White next saw Scott on April 29, 1998.  (Pls.' Ex. 1 at 3).  At that visit, Scott weighed 140 lbs.  (Id.).  With respect to Scott's weight gain, Dr. White observed that Scott's "weight has improved remarkably," and further remarked that Scott appeared "very healthy."  (Id.).  The lab work previously conducted at Dr. White's direction revealed that Scott's BUN and Creatinine levels were normal, tending to show that Scott's kidney function was normal at that time, and causing Dr. White to remark that "all of his previous lab work was fine."  (Pls.' Ex. 1 at 3, 6).  Dr. White concluded that Scott's irritable bowel syndrome was asymptomatic at the time of the April 29, 1998,

---

[1] Dr. White's letter to Dr. Fernandez reads, "[a]s you will recall, he [Scott] is a 19 year old male who recently had a 20 pound unintentional weight loss despite 'eating like a horse.'" Presumably, Dr. White received this information from Scott who, however, testified that he could not recall losing twenty pounds but conceded that he had lost weight prior to seeing Dr. White. (Tr. at 57-58).

3

visit.  (Id.).

A note from Scott's medical records indicates that
Scott was seen by a doctor other that Dr. Fernandez at the Upper
Kanawha Health Center on January 7, 1999, for a sore throat.
(Pls.' Ex. 2 at pg. 5).  Scott's weight at that time was 134.5
pounds.  (Id.)

B.    The July 19, 1999, Visit

Near the middle of July, 1999, Scott and his family
vacationed in Myrtle Beach, South Carolina.  (Tr. at 33).  On
July 17, 1999, his last evening at the beach, Scott had prime rib
and shellfish for dinner.  (Id. at 56).  When traveling home to
West Virginia on July 18, 1999, Scott had diarrhea necessitating
frequent stops of the vehicle.  (Id. at 34).  During the trip
home, Scott noticed swelling in his lower legs.  (Id. at 35).

On the morning of July 19, 1999, Scott woke up to find
that his face, lips, legs and genitals were "puffy."  (Id. at 35-
36).  That same morning, Scott and Sharon went to see Dr.
Fernandez.  (Id. at 36).  Scott's weight at that visit was 141.75
pounds and his blood pressure was 120/70.  (Pls.' Ex. 2 at pg.
6).  Scott's chief complaint was swelling in his legs and lips.
(Id.).

4

The parties dispute whether Dr. Fernandez examined Scott's legs during the July 19, 1999, office visit.  This disputed fact is of particular importance because the expert witnesses in this case agree that the standard of care required Dr. Fernandez to examine Scott's legs for the presence of edema.[2]

Scott testified that his mother was present with him at all times during his visit with Dr. Fernandez.  (Id. at 36-37).  Scott further stated that Dr. Fernandez came into the room where he and his mother were waiting, Dr. Fernandez looked at him, looked at his lips, left the room, and then returned and informed him that he had sun poisoning.  (Id. at 36).  Sharon Hannigan similarly testified that Dr. Fernandez failed to conduct any type of physical examination and simply told Scott that he had sun poisoning.  (Id. at 94-95).

---

[2]  It is noted that the kidneys are organs which serve, among other things, the essential functions of removing waste products and excess fluid from the blood.  (National Kidney Foundation Pamphlet at 1, attached as Depo. Ex. 5 to Jt. Ex. 7). Edema refers to swelling and can be a symptom of kidney disease resulting from excess fluid accumulation.  (Dr. Berger Depo. Vol. II at 34, 37, Jt. Ex. 7).  Edema related to kidney disease is gravity dependent, meaning it goes to the lowest point of the body.  (Id. at 37; Tr. at 203).  To detect edema a physician will apply pressure to an area with a finger and then look for an indentation, which, if found, would indicate the presence of fluid under the skin. (Tr. 203-04).

Dr. Fernandez offered a different version of events and on direct examination testified

Q. Now, doctor, after you received this information [referring to Scott's complaints], did you physically examine Mr. Hannigan in the office?

A. Yes, I examine the legs of the patient. That's the legs, and see whether there is edema of the legs. I could not see any edema at that time.

Q. Now, doctor, could you tell -- tell us, how did you examine his legs to check for edema?

A. I will check the -- touch the skin of the leg and see if there's pitting edema because pitting edema can tell us whether there is fluid under the skin, and I check the leg to see if there was any edema.

Q. And what was the result of your examination of his legs?

A. I did not see -- when I examined the legs, I did not see any edema.

Q. Now, do you recall what clothing he was wearing that day back in July 19, 1999?

A. I don't recall.

Q. How do you know that he -- how do you know that you actually looked at his legs when you did this examination?

A. You just touch the leg, check the skin and see if there is any edema. You can just lift the -- if he has long pants, you can just lift the long pants, or if he has socks, you can just drop the socks.

Q. And was that your habit and routine for checking for pitting edema or edema in the legs, is that the way that you -- your habit and routine for doing that?

A.  That's right.

Q.  Now, doctor, did you have him disrobe in order to conduct this examination? [ . . .]

A.  No, we don't -- if they are only complaining of swelling of the leg or swelling on the lips, we don't remove the clothes off.

Q.  And why -- why not?

A.  Because you can examine the face, the lips, and you can -- without the -- without the clothes off, and you can examine the legs without removing the clothes.

Q.  And if you look at his lower legs in order to look for the pitting edema, why wouldn't you look at the rest of his legs to see if he had some sort of edema in the other portions of his legs?

A.  When you look at the legs, if there is edema, there would be swelling of the lower legs and the ankle and the foot. Because of the gravity of the fluid going down, you can see the swelling in the lower legs.

(Tr. at 256-58).  Dr. Fernandez further examined Scott's face and found swelling and redness only on Scott's upper lip.  (Id. at 258).  She diagnosed Scott with Herpes Simplex Virus 1, commonly known as a cold sore, and prescribed a steroid cream to treat the inflammation on the lip.  (Id. at 258-59).  Dr. Fernandez did not order any type of lab work, but did tell Scott to return in one week.  (Id. at 259).

The court finds Dr. Fernandez's recollection of the July 19, 1999, office visit to be more credible.  Dr. Fernandez's notes

7

from that visit read "Legs - no edema." This is the only written
record of the office visit and is consistent with Dr. Fernandez's
testimony that she examined Scott's legs and found no edema.
(Pls.' Ex. 2 at pg. 6). Moreover, while Scott's version of events
suggests Dr. Fernandez spent, at most, a few minutes with Scott,
Sharon Hannigan testified that she and Scott were with Dr.
Fernandez for "[p]robably maybe thirty minutes total." (Tr. at
97). Sharon Hannigan's testimony thus corroborates the more
thorough examination described by Dr. Fernandez, indicates that
there was ample time for Dr. Fernandez to conduct an examination
of Scott's leg for edema, and casts Scott's recollection of the
July 19, 1999, office visit as faulty.

There is other evidence of record which suggests Scott
may not have an entirely accurate recollection of his interactions
with doctors. In Dr. White's letter to Dr. Fernandez he notes
that Scott has experienced a "20 pound unintentional weight loss
despite 'eating like a horse.'" (Pls.' Ex. 2 at 10). Although
acknowledging that he lost weight, Scott testified that he could
not remember telling Dr. White that he lost twenty pounds. (Tr.
at 57-58). Additionally, Scott's medical records indicate that he
informed a doctor that he had a seizure while shooting pool at a
bar in September of 2006; however, when queried the following

8

month at trial, Scott was unable to recall this statement to the doctor. (Id. at 76-77). Of further concern respecting Scott's credibility is the fact that on September 16, 2006, he requested a prescription of painkillers and subsequently forged both the amount of pills listed on the prescription and the number of refills in an effort to obtain additional painkillers.[3] (Jt. Stip. Part III at 9, Jt. Exhibit 5).

Plaintiffs attempt to discredit Dr. Fernandez's version of the visit by highlighting the fact that Dr. Fernandez can remember conducting an examination of Scott's legs and further recalls not directing Scott to undress, but was unable to recollect what Scott was wearing during the examination. (Tr. at 257-58, 293; Pls.' Revised Proposed Findings at 5). When questioned by the court, however, Sharon Hannigan also had difficulty recalling what Scott was wearing during his visit with Dr. Fernandez. (Tr. at 110). The fact that both witnesses had trouble recalling what Scott was wearing over seven years before the date of their testimony at trial simply serves to emphasize that Dr. Fernandez's written notes of the visit are the most persuasive evidence that Dr. Fernandez did in fact examine Scott's

---

[3] Although this fact was not elicited in testimony during the trial, it is contained in the parties' joint stipulation of Scott's medical chronology, which was admitted into evidence.

9

legs for edema and the court so finds.  The court accordingly

finds unpersuasive plaintiffs' suggestion that because Dr.

Fernandez was unable to remember the clothing that Scott was

wearing on his July 19, 1999, visit that she was unable to

properly recall the physical examination of Scott on that date.

C.  Events Subsequent to the July 19, 1999, Visit

Scott applied the steroid cream that Dr. Fernandez

prescribed and also took Benadryl, an over-the-counter drug, and

the swelling in his face and body quickly disappeared.  (Tr. at

58-59).  Although Dr. Fernandez told Scott to return in a week, he

did not return as directed because his condition improved.[4]  (Id.

at 98-99, 259).

At the time of his trip to the beach in July of 1999,

Scott was unemployed.  (Id. at 85-86).  In August of 1999, Scott

_____

[4] Dr. Fernandez testified that she instructed Scott to
return in one week.  (Tr. at 259).  The last line of her notes
from the July 19, 1999, office visit appears to consist first of
the symbol "RV" followed by "1 week."  (Pls.' Ex. 2 at pg. 6).
Dr. Fernandez indicated that this notation meant "return visit
one week."  (Tr. at 260).  Sharon Hannigan, however, testified
that Dr. Fernandez did not tell Scott to return in one week, but
acknowledged that after the July 19, 1999, office visit Scott's
swelling went down and he started feeling better.  (Tr. at 97-
98).  Also, after acknowledging Scott's improvement following the
July 19, 1999 office visit, Mrs. Hannigan further testified that
she did not "know of any reason he [Scott] would have went back"
to see Dr. Fernandez prior to December of 1999.  (Id. at 98).

10

began working as a Class D millwright for QCI, a company that
rebuilt large generators. (Id. at 84-87). While at QCI, Scott
was working twelve-hour shifts six days a week. (Id. at 40).
In the fall of 1999, Scott began to experience swelling again but,
unlike the generalized swelling Scott experienced in July, this
time the swelling was confined to his feet and ankles when he
would come home from work. (Id. at 39, 98-99). Scott's older
brother observed the swelling and took Scott back to see Dr.
Fernandez on December 2, 1999. (Id. at 41).

D.    The December 2 and December 3, 1999, Visits

As of the December 2, 1999, visit, Scott's weight had
decreased slightly from his July 19, 1999, visit to 140.75 pounds;
however, Scott's blood pressure had increased significantly to
170/102. (Tr. at 260-61; Pls.' Ex. 2 at pg. 6). Scott's chief
complaint was "swelling from the waist down," but he also
indicated that he had chest pain for two weeks and experienced
shortness of breath when walking. (Tr. at 261-62; Pls.' Ex. 2 at
pg. 6). Dr. Fernandez conducted a physical examination and again
found no edema in Scott's legs. (Tr. at 263-64). In light of
Scott's complaints and his high blood pressure, Dr. Fernandez
ordered a urinalysis, blood work and an EKG. (Id. at 265-66).

11

Scott returned the following day for the blood work and also reported frequent urination. (Id. at 266). At that time, Dr. Fernandez had the results of the urinalysis which indicated the presence of blood and bacteria in Scott's urine. (Id. at 268). The urinalysis also indicated that Scott had an elevated protein level. (Urinalysis Test, Pls.' Ex. 2 at pg. 14). Dr. Fernandez diagnosed Scott as having a urinary tract infection and prescribed Septra DS. (Tr. at 268). Dr. Fernandez also wanted to "rule out renal disease." (Id.; Pls.' Ex. 2 at pg. 7). Dr. Fernandez directed Scott to return on December 7, 1999. (Tr. at 268).

On December 6, 1999, the results of the blood testing were available and there were abnormal findings indicating that Scott had renal disease. (Tr. at 269). Dr. Fernandez called the Hannigan residence and informed Scott that he had renal disease. (Id.) She further informed Sharon Hannigan that Scott needed to see a nephrologist, a doctor that specializes in the study of the kidney. (Id.) Sharon Hannigan became upset and told Dr. Fernandez that she was not interested in seeing a specialist recommended by Dr. Fernandez and that she would be selecting Scott's nephrologist. (Id. at 100). This was the last time Dr. Fernandez had any contact with Scott or his mother. (Id. at 270).

12

E.    Scott's Subsequent Treatment

        Sharon Hannigan contacted R. Vaughn Lamb ("Dr. Lamb"), a
nephrologist.  (Tr. at 101).  On December 21, 1999, Dr. Lamb saw
Scott.  (Def.'s Ex. 1, Dr. Lamb record).  In the eighteen days
since Scott had seen Dr. Fernandez, Scott's weight had increased
7.25 pounds, to 148 pounds, and his blood pressure when standing
was 190/120.  (Id.).  Upon physical examination of Scott, Dr. Lamb
detected edema in the lower leg.   (Id.).  By the middle of January
2000, Scott's weight had increased to 162 pounds, despite the fact
that he was taking a diuretic.  (Jt. Stip. I at 6, Jt. Ex. 3).

        Dr. Lamb diagnosed Scott as having chronic
glomerulonephritis ("GN") with nephrotic syndrome with very
advanced renal insufficiency associated with hypertension and
volume overload.  (Dr. Lamb Depo. at 110, Jt. Ex. 10).  Dr. Lamb
did not direct that a biopsy of Scott's kidneys be done to identify
a type of GN, because the risks outweighed the benefits of
performing a biopsy in Scott's circumstances and the treatments for
various types of GN are the same.  (Id. at 47, 109-11).  The
absence of a biopsy is of some significance because without a
biopsy of the kidney there is no way to make a specific diagnosis
with 100% accuracy of the type of kidney disease that afflicted
Scott.  (Tr. at 139-40).

                            13

Scott reached end stage renal disease in January/February of 2000 and was placed on hemodialysis in February of 2000. (<u>Id.</u> at 111-12, 154). Scott received a transplanted kidney from his father in February of 2001; however, Scott developed post-transplant diabetes and the transplanted kidney was ultimately removed due to chronic rejection. (Tr. at 49; Dr. Sankari Depo. Vol. I at 100, Jt. Ex. 11). Scott has remained on dialysis since July 2003. (Jt. Stip. I at 39).

F.    Procedural History

On November 29, 2001, plaintiffs commenced a civil action in the Circuit Court of Kanawha County, West Virginia, against Dr. Fernandez, Upper Kanawha Health Association, Valley Health Systems, Inc., Dr. Lamb, and Charleston Renal Group, Inc. Defendants Dr. Fernandez, Upper Kanawha Health Association and Valley Health Systems, Inc., failed to respond and a default judgment against them was entered by the circuit court on February 6, 2002.

Although not yet a party defendant, the government removed the action on February 13, 2002, inasmuch as the United States Department of Health and Human Services had, pursuant to the Federally Supported Health Centers Act of 1996, designated Valley

Health Systems, Inc., and its employees including Dr. Fernandez as

eligible for coverage under the Federal Tort Claims Act, 28 U.S.C.

§§ 2671, (the "FTCA").   Contemporaneously with the notice of

removal, the government filed a motion to substitute it as the

party defendant for defendants Valley Health Systems, Inc., Dr.

Fernandez and Kanawha Valley Health Association, an affiliate of

Valley Health Systems, Inc.   The government also filed a motion

seeking to dismiss the action as to it because the plaintiffs had

failed to exhaust their administrative remedies under the FTCA.

On June 6, 2002, the court entered an agreed order

dismissing the action without prejudice.   The order provided that:

> Under these circumstances, plaintiffs and defendants
> Charleston Renal Group, Inc., and Robert Vaughn Lamb,
> M.D. have stipulated and agreed to a dismissal of
> plaintiffs' action against them, without prejudice to
> refiling the suit against them once plaintiffs have
> exhausted their administrative remedies and the case is
> ripe for refiling against the United States.   The parties
> further agree that such stipulations constitute a waiver
> of any statute of limitations defense by defendants so
> long as the case is refiled on or before October 27,
> 2002.

On March 28, 2002, plaintiffs filed an administrative claim as

required under the FTCA seeking $15 million dollars in damages,

which claim was denied.   (Jt. Exs. 1 and 2).   In accordance with

the agreed order of June 6, 2002, plaintiffs instituted this action

on October 25, 2002.   Dr. Lamb and Charleston Renal Group were

15

subsequently dismissed pursuant to a stipulation entered November 25, 2003.  Notice was given to the plaintiffs that their administrative claim was denied on December 17, 2002.  (Jt. Ex. 2).

By way of order dated October 12, 2004, the court denied the government's motion for summary judgment and the plaintiffs' motion for partial summary judgment.  The government moved to dismiss the action on October 29, 2004, and, by way of order entered January 7, 2006, the court denied the motion and further held that the case shall proceed under the $1 million noneconomic damages cap as established by the West Virginia Legislature.

Plaintiffs contend that Dr. Fernandez was negligent in her evaluation, care and treatment of Scott on July 19, 1999.  (Pls.' Prop. Find. at 2).  According to the plaintiffs, Dr. Fernandez deviated from the standard of care inasmuch as she (1) failed to take a detailed and focused history from Scott and Sharon when Scott complained of swelling of the lips and legs, (2) should have performed a more thorough physical examination of Scott, and (3) also should have ordered both a urinalysis and blood testing.  (Id.).  Plaintiffs insist that Dr. Fernandez's negligence was the proximate cause of Scott Hannigan's permanent injury to his kidneys.  (Id.).

16

II.

Under the FTCA, federal district courts have jurisdiction of civil actions against the United States in which monetary damages are sought

> [F]or injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The government concedes that Dr. Fernandez was acting in the scope of her employment with the government when she allegedly negligently treated Scott. It is further undisputed that plaintiffs have filed the requisite administrative action under 28 U.S.C. § 2675(a). Inasmuch as the alleged negligence took place in West Virginia the court applies West Virginia law.

At the time this action was instituted, West Virginia Code section 55-7B-3 provided in relevant part

> The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
>
> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

17

(2) Such failure was a proximate cause of the injury or
death.[5]

In a "loss of a chance" medical malpractice case, such
as this, to establish liability the plaintiff must demonstrate
that the defendant's acts or omissions have increased the risk of
harm to the plaintiff and that such increased risk of harm was a
substantial factor in bringing about the ultimate injury to the
plaintiff.  Thornton v. CAMC, 305 S.E.2d 316 Syl. Pt. 5 (W. Va.
1983).

With respect to the standard of care West Virginia Code
section 55-7B-7 provides

> The applicable standard of care and a defendant's
> failure to meet said standard, if at issue, shall be
> established in medical professional liability cases by
> the plaintiff by testimony of one or more
> knowledgeable, competent expert witnesses if required
> by the court. Such expert testimony may only be
> admitted in evidence if the foundation, therefor, is
> first laid establishing that: (a) The opinion is
> actually held by the expert witness; (b) the opinion
> can be testified to with reasonable medical
> probability; (c) such expert witness possesses
> professional knowledge and expertise coupled with
> knowledge of the applicable standard of care to which
> his or her expert opinion testimony is addressed; (d)
> such expert maintains a current license to practice
> medicine in one of the states of the United States; and
> (e) such expert is engaged or qualified in the same or
> substantially similar medical field as the defendant

---

[5] This statute was subsequently amended in 2003; however,
the amendment is inapplicable inasmuch as this action was
instituted prior to the effective date of the amendment.

health care provider.[6]

### III.

In view of the underlying facts found by the court as above, resolution of this dispute hinges on the weight afforded the testimony of the parties' expert witnesses.

A.   Dr. Rutecki

Plaintiffs rely on the expert testimony of Gregory W. Rutecki, M.D. ("Dr. Rutecki"), who is board certified in internal medicine and nephrology. (Tr. at 118-19). Dr. Rutecki testified that when presented with a thin twenty-year old male with swelling all over his body or only in his legs and face, the examining physician was "obligated to do a thorough history and physical exam, and then order tests contingent on the findings of history and physical." (Id. at 127). According to Dr. Rutecki, "[i]f there is a serious cause for the swelling, it's usually due to disease in one of three organs--the heart, the liver, or the kidney." (Id. at 128). Dr. Rutecki further observed that

After the history and physical are completed, you may

---

[6] Section 55-7B-7 was also amended in 2003. The court again observes that the action was filed prior to the effective date of the amendment.

19

or may not have a clear-cut idea as to which of the
three organs you are looking at.  Some fairly simple
tests will help with the kidneys which are kind of
hidden.  You can't see them on exam or listen to them.
So a urinalysis, which is a very straightforward test,
can be done and will tell someone at that point in time
if there's protein in the urine that might be
responsible for the edema or swelling.

(Id. at 130).

     With respect to the manner in which Dr. Fernandez
conducted the physical exam, Dr. Rutecki opined that for a
thorough examination of a patient's complaint of swelling the
patient would need to be "completely disrobed or reasonably
undressed."  (Id. at 128).  Even if edema was not present upon a
physical examination, Dr. Rutecki testified that in this case a
doctor would be "a bit more vigilant" in light of Scott's 7.25
pound weight gain from January 7, 1999, to July 19, 1999.  (Id. at
133-34).  Dr. Rutecki "suspected" that Scott's weight gain
"represented fluid gain rather than fat or anything else [and] was
a manifestation of his fluid retention and kidney disease."  (Id.
at 134).  It is Dr. Rutecki's opinion that Scott was suffering
from kidney disease on July 19, 1999, and had Dr. Fernandez done a
urinalysis and blood testing on that date, it would have revealed
a "glomerulonephritis at an earlier stage than his diagnosis was
made."  (Id. at 138-40).  Dr. Rutecki further opined that had
Scott's kidney disease been diagnosed in July of 1999 there were

20

medical interventions which could slow down the disease process in the kidneys; however, Dr. Rutecki conceded that even with these interventions it was unclear as to how long Scott could have avoided dialysis.  (Id. at 153-54, 157).

On cross-examination, Dr. Rutecki acknowledged that he had no criticism of Dr. Fernandez's treatment of Scott in December of 1999.  (Id. at 152).  He further admitted that he had not reviewed the records of Dr. White, Scott's treating gastroenterologist, which were present in Dr. Fernandez's chart. (Id. at 159).  Dr. Rutecki also noted that the swelling associated with kidney disease typically does not respond to Benadryl.  (Id. at 170).

B.    Dr. Rosencrance

James G. Rosencrance, M.D. ("Dr. Rosencrance"), who is board certified in internal medicine and serves as the chairman of the Department of Internal Medicine for West Virginia University at Charleston, was called by the government to testify as an expert witness.

Dr. Rosencrance opined that Dr. Fernandez met the standard of care when she evaluated Scott on July 19, 1999. (Tr. at 201).  In support, Dr. Rosencrance testified that the physical

examination conducted by Dr. Fernandez only revealed swelling of the upper lip and the results of this physical examination did not warrant additional testing.  He further opined that when examining a patient for pitting edema, a doctor simply rolls the pants up or takes the socks down.  (Id. at 202).  Dr. Rosencrance testified that it was his belief that Scott was experiencing an allergic reaction when he presented to Dr. Fernandez on July 19, 1999, inasmuch as Scott's edema, as explained by the Hannigans, had a rapid onset and resolution. (Id. at 206-07).  Even if a urinalysis had been done on July 19, 1999, Dr. Rosencrance opined that it would have been normal.  (Id. at 221-22).

C.   Dr. Berger

The expert testimony of Bruce E. Berger, M.D. ("Dr. Berger") was also presented.  Dr. Berger is board certified in internal medicine and nephrology. (Dr. Berger Depo. Vol. I at 5, Jt. Ex. 7).  Dr. Berger similarly opined that Dr. Fernandez's July 19, 1999, examination and diagnosis satisfied the standard of care.  (Id. at 13).  According to Dr. Berger, the explosive, whole body swelling that Scott allegedly experienced in July of 1999 was not consistent with the swelling typically associated with kidney disease.  (Id. at 16).  He notes that the more typical presentation of swelling associated with kidney disease is, "at

22

the end of the day," mild dependent edema. (Id. at 39). With respect to the edema present in Scott's lips, Dr. Berger stated that dependent edema from kidney disease that is found in the face is typically not found in the lips, rather it is found around the eyes. (Id. at 37, 65). Dr. Berger further observed that Scott's blood pressure was normal at the July 19, 1999, office visit and most people who suffer from kidney disease have high blood pressure. (Id. at 16-17).

Dr. Berger believes that Scott suffered from a particularly aggressive form of glomerulonephritis, known as membranoproliferative glomerulonephritis Type II, which is characterized by a rapid deterioration of kidney function. (Id. at 30-31). According to Dr. Berger, rapid deterioration of Scott's kidney function over the course of only a few months was indicated by, among other things, two ultrasound examinations of his kidneys performed in December of 1999 and January of 2000, which revealed that they were normal sized. (Id. at 46-47). More specifically, had the kidney disease been present for some time, the kidneys would have been scarred and shrunken in size, as the scar tissue replaced fluid in the kidneys. (Id. at 47; Dr. Berger Depo. Vol. II at 42-43, Jt. Ex. 8). Scott's dramatic weight gain from December 2, 1999, to the middle of January of

2000 was further evidence of a rapid deterioration in Scott's kidney function. (Dr. Berger Depo. Vol. I at 36, Jt. Ex. 7).

Dr. Berger is of the belief that even if Scott had kidney disease on July 19, 1999, it was "mild," with the disease rapidly and dramatically taking a turn for the worse in late November of 1999 to January of 2000. (Dr. Berger Depo. Vol. II at 21-22, Jt. Ex. 8). Even assuming that Scott received treatment for his kidney disease in July of 1999, Dr. Berger is of the belief that Scott's outcome would not have changed. (Id. at 76-77).

IV.

Reduced to its essence, the parties' dispute with respect to the standard of care is whether Dr. Fernandez was required to order laboratory testing on July 19, 1999, in order to satisfy the standard of care. Having carefully weighed the contradictory expert testimony on this issue, the court concludes that based on Scott's history and presentation on that date, Dr. Fernandez was not required to order additional laboratory testing.

The testimony of Dr. Rutecki that Dr. Fernandez breached the standard of care was unpersuasive. According to Dr. Rutecki, tests should be ordered "contingent on the findings of history and physical." At the July 19, 1999, office visit Dr. Fernandez took a

history from Scott in which he complained of swelling in the lips and legs. Dr. Fernandez then conducted a physical exam and found there was no edema present in Scott's legs.[7]  Dr. Fernandez's physical exam did reveal edema present in Scott's lips; however, this is not where a doctor would typically find edema that is associated with kidney disease.

In an effort to reconcile his testimony that testing is contingent upon the findings of a history and physical and the fact that Dr. Fernandez's physical examination of Scott did not reveal any edema associated with kidney disease, Dr. Rutecki testified a doctor would be "a bit more vigilant" in light of Scott's recent weight gain. Dr. Rutecki, however, is not a treating physician in this case and conceded he did not review Dr. White's records. Those records indicate that Dr. White, Scott's treating gastroenterologist, was not only unconcerned about Scott's weight gain but was pleased with it and attributed it to resolution of his irritable bowel syndrome. Dr. Fernandez testified that Scott's weight gain was "within normal limits," similarly attributed the

---

[7] With respect to the manner in which Dr. Fernandez conducted the physical exam on July 19, 1999, the court rejects Dr. Rutecki's opinion that Dr. Fernandez should have asked Scott to disrobe and finds persuasive the opinion of Dr. Rosencrance that it was sufficient for Dr. Fernandez to check for the presence of edema in Scott's legs by simply rolling up Scott's pants and pulling down Scott's socks.  (Tr. at 202-03).

weight gain to his recovery from irritable bowel syndrome, and reasonably concluded that Scott's weight gain was not cause for alarm or reason for increased vigilance.  (Tr. at 255).

Dr. Berger and Dr. Rosencrance both observed that one would also expect to find high blood pressure in a person suffering from kidney disease.  On July 19, 1999, Scott had a slightly higher blood pressure and complained of swelling in his legs and lips. Thus, at the July 19, 1999, visit Scott arguably had two symptoms of kidney disease: swollen feet and ankles and elevated blood pressure.

With respect to the swelling, as Dr. Berger explained, the generalized edema of which Scott complained in July of 1999 is not the type of edema associated with kidney disease.  In any event, upon her examination of Scott, Dr. Fernandez found that there was no swelling in Scott's legs, where edema associated with kidney disease is typically found.  Additionally, while Scott's blood pressure was slightly higher at the July 19, 1999, office visit, relative to the blood pressure recorded on his first visit with Dr. Fernandez, Scott's blood pressure was still within the normal range and was not considered "elevated."  (Tr. at 229). Accordingly, Scott's history and physical examination indicated that Scott was not suffering from any of the symptoms of kidney

26

disease at his July 19, 1999, visit.

The only edema found in Scott was on his lips and Dr.
Fernandez, observing the edema and redness in his lips, diagnosed
Scott as having Herpes Simplex Virus 1.  With the benefit of
hindsight, it appears that this diagnosis was erroneous inasmuch as
a subsequent test revealed that Scott did not test positive for
Herpes Simplex Virus.  (Tr. at 297).  Nonetheless, this diagnosis
was reasonable given Scott's presentation.  Even Dr. Rutecki
acknowledged that physicians generally do not confirm a diagnosis
of Herpex Simplex Virus 1 with testing.  (Tr. at 220, 136).

In any event, while plaintiffs are highly critical of the
care provided by Dr. Fernandez on July 19, 1999, the facts of this
case indicate that Dr. Fernandez's treatment worked: both Scott and
Sharon Hannigan testified that shortly after the July 19, 1999,
visit, Scott's swelling went away.

In short, the standard of care did not require Dr.
Fernandez to conduct further testing for a disease she had no
reason to suspect was present in Scott.[8]  Based on Scott's history

_____

[8] Although Dr. Fernandez did subsequently order a urinalysis
and blood testing based on Scott's December 2, 1999, visit
despite the fact that she again did not find edema in Scott's
legs upon her physical examination, Scott's presentation at that
visit was different than his presentation on July 19, 1999.  Most

and presentation, Dr. Fernandez reasonably diagnosed Scott with Herpes Simplex Virus 1, a diagnosis which would account for Scott's swelling in his lips -- the only swelling revealed upon a physical examination of Scott.  This reasonable explanation for Scott's swelling in his lips obviated the need for further testing to explore the source of Scott's swelling.  (Tr. at 222-23, 225).

In view of the foregoing, the court finds persuasive the expert opinions of both Dr. Rosencrance and Dr. Berger that further testing was not called for on July 19, 1999, and Dr. Fernandez satisfied the standard of care when she treated Scott in the July 19, 1999, office visit.

Although the finding that Dr. Fernandez satisfied the standard of care defeats plaintiffs' negligence claim, the court also addresses Dr. Rutecki's speculative opinion that Scott was suffering from kidney disease on July 19, 1999.  Dr. Rutecki's opinion that Scott suffered from kidney disease appears to be founded on his suspicion that Scott's weight gain "represented

---

significantly, on December 2, 1999, Scott's blood pressure was dramatically higher.  Scott also complained of, among other things, chest pains and shortness of breath when walking.  The elevated blood pressure combined with Scott's serious complaints indicated to Dr. Fernandez that further laboratory testing was warranted.  (Tr. at 265).

fluid gain rather than fat or anything else [and] was a
manifestation of his fluid retention and kidney disease." (Tr. at
134). The evidence before the court, however, indicates that
Scott's weight gain from January to July of 1999 was not the result
of fluid gain, but rather resolution of Scott's irritable bowel
syndrome. Indeed, had Scott experienced a nearly eight pound fluid
weight gain from January of 1999 to July of 1999, as Dr. Rutecki
suggests, his body would have had been carrying the equivalent of
nearly two 2-liter bottles of soda. It would be expected that such
a large amount of fluid weight gain would manifest itself upon
physical examination in the form of dependent edema in the legs or
near the eyes. Dr. Fernandez, however, did not find this type of
edema in Scott upon her physical examination of him on July 19,
1999, nor were there any other symptoms of kidney disease present
in Scott. In fact, edema was not found in Scott until December 21,
1999, over five months after the July 19, 1999, office visit.

Moreover, had Scott been experiencing edema related to
kidney disease on July 19, 1999, one would not expect it to respond
to Benadryl and quickly disappear overnight as it did in this case.
Dr. Rutecki's opinion that Scott was suffering from kidney disease
on July 19, 1999, is also called into doubt by the testimony of Dr.
Berger in which he opines that Scott had a rapidly progressing

29

kidney disease and earlier detection and intervention of the disease would not have afforded Scott any benefit. Dr. Berger's opinion was supported by undisputed evidence of record including, among other things, the December and January ultrasounds of Scott's kidneys and Scott's explosive weight gain from early December of 1999 to the middle of January 2000. In view of the foregoing, the court further finds that in addition to failing to demonstrate that Scott was exhibiting any symptoms of kidney disease when he visited Dr. Fernandez on July 19, 1999, the plaintiffs have not demonstrated that Scott was in fact suffering from kidney disease on that date.

As a final note, the court observes that presence of such a debilitating disease in a young man is extremely unfortunate; however, this disease and Scott's injuries resulting from the disease are simply not attributable to the conduct of Dr. Fernandez.

V.

In view of the foregoing, the court concludes that Dr. Fernandez was not negligent in her treatment of Scott Hannigan on July 19, 1999. A judgment order will follow.

30

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

DATED: March 20, 2007

John T. Copenhaver, Jr.
United States District Judge